Amanda C. Sommerfeld (State Bar No. 185052)
asommerfeld@JonesDay.com
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA  90071
Telephone:    +1.213.489.3939
Facsimile:    +1.213.243.2539

Allison E. Crow (State Bar No. 279078)
acrow@jonesday.com
Elizabeth K. Yates (State Bar No. 313184)
eyates@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone:   +1.415.626.3939
Facsimile:   +1.415.875.5700

Attorneys for Defendant
CSX INTERMODAL TERMINALS, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **Anil Goyal, et al.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**CSX Intermodal Terminals, Inc.,**<br><br>**Defendant.** | **Case No. 3:17-cv-06081-EMC**<br><br>**DEFENDANT CSX INTERMODAL TERMINALS, INC.'S RULE 12(C) NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>**Date:**  **August 16, 2018**<br>**Time:**  **1:30 p.m.**<br>**Judge:**  **Edward M. Chen**<br>**Courtroom:**  **5, 17th Floor** |

1    **TO THE COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2         **PLEASE TAKE NOTICE** that on August 16, 2018 at 1:30 p.m. or as soon thereafter as

3    the matter may be heard in the courtroom of the Honorable Edward Chen in Courtroom 5, 17th

4    Floor of the United States District Court for the Northern District of California, located at 450

5    Golden Gate Avenue, San Francisco, California, Defendant CSX Intermodal Terminals, Inc. will

6    and hereby does move this Court for an order, pursuant to Federal Rule of Civil Procedure 12(c),

7    for judgment on the pleadings against Plaintiffs.

8         Defendant moves for judgment on the pleadings on the basis that Plaintiffs' third, fourth,

9    fifth, and seventh causes of action are preempted by the federal Truth-in-Leasing Regulations;

10   that the Plaintiffs' first cause of action is preempted by the Truth-in-Leasing Regulations except

11   as to Plaintiffs' claims for reimbursement of costs related to the use of cellphones on the job; and

12   that the Plaintiffs' second cause of action facially fails to give rise to liability under state law and

13   therefore should be dismissed.

14        This motion is based on the following Memorandum of Points and Authorities, the

15   supporting Declaration of Jackie Kennedy and its attached exhibits, the proposed order, and all

16   other pleadings and papers on file in this action, and such argument as the Court may hear in this

17   matter.

18
19   Dated:  July 12, 2018                              Respectfully submitted,

20
21                                       By:  /s/ Amanda C. Sommerfeld
                                              Amanda C. Sommerfeld
22
                                         JONES DAY
23                                       Attorneys for Defendant
                                         CSX INTERMODAL TERMINALS, INC.
24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................. 2

I.      The Parties and the Lease Agreements That Governed Their Relationships..................... 2

II.     Procedural Background ................................................................................ 3

STANDARD OF REVIEW ................................................................................... 4

ARGUMENT ....................................................................................................... 5

I.      The Plaintiffs' First Cause of Action Under California Labor Code Section 2802
        Fails as a Matter of Law ............................................................................. 6

        A.      The Truth-in-Leasing Regulations specifically permit certain contractual
                terms in leasing agreements like those at issue here ............................... 6

        B.      The Truth-in-Leasing Regulations preempt the plaintiffs' first cause of
                action under Section 2802 except as to one narrow theory of relief................... 9

II.     The Plaintiffs' Second Cause of Action Should Be Dismissed in its Entirety ................ 14

        A.      The Truth-in-Leasing Regulations preempt the plaintiffs second cause of
                action .......................................................................................... 14

        B.      The second cause of action facially fails as alleged and therefore does not
                give rise to liability ........................................................................ 15

III.    Federal Law Preempts the Plaintiffs' Third, Fourth, and Fifth Causes of Action ........... 17

IV.     The Truth-in-Leasing Regulations Preempt Plaintiffs' Seventh Cause of Action
        Arising Under Business & Professions Code Section 17200 ........................................ 20

CONCLUSION ................................................................................................. 21

# <u>TABLE OF AUTHORITIES</u>

**Page**

**C**ASES

*Am. Trucking Ass'ns v. United States*,
344 U.S. 298 (1953) ....................................................................................7

*Arizona v. United States*,
567 U.S. 387 (2012) ....................................................................................5

*Armenta v. Osmose, Inc.*,
135 Cal. App. 4th 314 (Ct. App. 2005) ......................................................18

*Armstrong v. Exceptional Child Ctr., Inc.*,
135 S. Ct. 1378 (2015) ................................................................................5

*Bluford v. Safeway Stores, Inc.*,
216 Cal. App. 4th 864 (Ct. App. 2013) ......................................................18

*Chae v. SLM Corp.*,
593 F.3d 936 (9th Cir. 2010) .......................................................................5

*Conley v. R.J. Reynolds Tobacco Co.*,
286 F. Supp. 2d 1097 (N.D. Cal. 2002) ......................................................9

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
458 U.S. 141 (1982) ...............................................................................5, 11

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ....................................................................................9

*Gregg v. Haw., Dep't of Pub. Safety*,
870 F.3d 883 (9th Cir. 2017) .......................................................................5

*Owner-Operator Indep. Drivers Ass'n v. United Van Lines, LLC*,
556 F.3d 690 (8th Cir. 2009) .....................................................................10

*Prachasaisoradej v. Ralphs Grocery Co., Inc.*,
165 P.3d 133 (Cal. 2007) ......................................................................15, 16

*Remington v. J.B. Hunt Transp., Inc.*,
Nos. 15-10010-RGS, 15-13019-RGS, 2016 WL 4975194 (D. Mass. Sept. 16,
2016) ..........................................................................................8, 10, 13, 14

*Rodriguez v. RWA Trucking Co., Inc.*,
 238 Cal. App. 4th 1375 (Ct. App. 2013) ..................................................................7, 8, 10

*S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations*,
 48 Cal. 3d 341 (1989) ..............................................................................................13

*United States v. Ritchie*,
 342 F.3d 903 (9th Cir. 2003) ....................................................................................2, 5

*Valadez v. CSX Intermodal Terminals, Inc.*,
 No. 3:15-cv-05433-EDL, 2017 WL 1416883 (N.D. Cal. Apr. 10, 2017) ........................ passim

**STATUTES**

49 U.S.C. § 13902 ....................................................................................................7

49 U.S.C. § 13906 ..................................................................................................9, 10

49 U.S.C. § 14102 ....................................................................................................7

Cal. Bus. & Prof. Code §§ 17200–09 ...........................................................................20

Cal. Lab. Code § 221 ........................................................................................... passim

Cal. Lab. Code § 224 ..............................................................................................15, 16

Cal. Lab. Code § 226.2 ..............................................................................................17

Cal. Lab. Code § 226.7 ......................................................................................... passim

Cal. Lab. Code § 512 ................................................................................................17

Cal. Lab. Code § 2802 ......................................................................................... passim

Federal Aviation Administration Authorization Act, 49 U.S.C. § 14501 ..............................4

**OTHER AUTHORITIES**

49 C.F.R. § 376 ..................................................................................................1, 4, 7

49 C.F.R. § 376.11 ....................................................................................................7

49 C.F.R. § 376.12(i) ................................................................................................14

49 C.F.R. § 376.12(a) ................................................................................................12

49 C.F.R. § 376.12(c)(1) .............................................................................................12

49 C.F.R. § 376.12(d) ...............................................................................17, 18, 19

49 C.F.R. § 376.12(e) ........................................................................... passim

49 C.F.R. § 376.12(j)(1) ...............................................................8, 10, 11

49 C.F.R. § 376.12(j)(3) ...................................................................8, 12

49 C.F.R. § 376.12(k) ...........................................................................8

49 C.F.R. § 376.2(m) ...........................................................................18

Fed. R. Civ. P. 12(c)..............................................................................1

U.S. Const., Article VI, cl. 2 ...............................................................5

1

## INTRODUCTION

In this case, the plaintiffs allege that defendant CSX Intermodal Terminals Inc. ("CSXIT") violated various wage and hour provisions of California law.  All of these plaintiffs were slated to be members of the prospective class in *Valadez v. CSX Intermodal Terminals, Inc.*, No. 3:15-cv-05433-EDL, 2017 WL 1416883 (Apr. 10, 2017, N.D. Cal.)—a case presenting materially identical claims against CSXIT.  Second Amended Complaint ("Complt.") (Dkt. No. 78) ¶ 6.  In *Valadez*, this Court awarded partial summary judgment to CSXIT, concluding that the federal "Truth-in-Leasing Regulations," *codified at* 49 C.F.R. § 376, *et seq.*, enacted to prescribe the relationship between semi-tractor truck owner operators and those involved in the transportation of goods who contract with them, *preempted* most of the first cause of action and all of the second cause of action.  *Valadez*, 2017 WL 1416883, at *14.  Those regulations, it held, preempted the state laws on which these causes of action rested by affirmatively permitting what the state laws purported to prohibit.  *Id*. at *9–11.  Seeking to escape that ruling, the plaintiffs here decided to pursue personal relief without the class, hoping to obtain a more favorable result before a different judge.

The plaintiffs now seek relief under seven distinct causes of action, all of which are based on California law.  The first two are identical to the causes of action that this Court already held were preempted in *Valadez*.  The plaintiffs' third, fourth, fifth, and seventh causes of action are also preempted, because they too rest on state laws that purport to ban what federal regulations permit.  (And even aside from preemption, the plaintiffs' second claim facially fails as alleged under state law, even if one assumes the truth of the facts alleged.)  CSXIT therefore moves under Fed. R. Civ. P. 12(c) for partial judgment on the pleadings on the first, second, third, fourth, fifth and seventh causes of action under the Truth-in-Leasing Regulations, *except* to the extent plaintiffs allege that they are entitled to reimbursement under California Labor Code § 2802 for money spent on "cellular telephone and applications required for receiving dispatch assignments and tracking progress."  Complt. ¶ 92.

1

**FACTUAL BACKGROUND**

2   **I.      The Parties and the Lease Agreements That Governed Their Relationships.**

3          CSXIT provides rail terminal support services to CSX railroad, CSX's railway partners,

4   and their customers in connection with the movement of freight in interstate commerce.  Each of

5   the plaintiffs in this case is the owner-operator of a commercial semi-truck, and each contracted

6   with CSXIT to transport cargo on or off CSXIT railway terminals.  More specifically, the

7   plaintiffs all entered into Contractor Operating Lease Agreements ("Lease Agreements" or

8   "COLAs") under which they agreed to lease their semi-trucks to CSXIT in order to do so.  (As

9   this brief explains in greater detail below, the Court can consider the agreements in deciding

10  whether to award judgment on the pleadings, because the pleadings "refer[] extensively" to them

11  and because they "form the basis" of the plaintiffs' claims.  *United States v. Ritchie*, 342 F.3d

12  903, 908 (9th Cir. 2003).)  Under these Lease Agreements, which are common in the freight

13  transportation industry, the semi-truck owner-operators agreed that they would retain physical

14  possession of their semi-trucks, and that they would drive those trucks to transport cargo for

15  CSXIT.  CSXIT requested the services of owner-operators and their semi-trucks on an as-needed

16  basis, and those who accepted CSXIT's offers came to pick up the cargo and move it.

17          Generally, each of the Lease Agreements contained similar terms regarding compensation

18  and performance.  For example, the Lease Agreements expressly stated that the owner-operators

19  would work as independent contractors rather than as employees.  *See* Declaration of Jackie

20  Kennedy ("Kennedy Decl."), ¶ 4, Exs. 1 through 5, § 2.  Each expressly allocated to owner-

21  operators the responsibility for their semi-trucks' fuel and other operating costs, and empowered

22  CSXIT to deduct, or "charge-back," from the owner-operator's contractual payments any such

23  costs that CSXIT advanced.  *Id.* Exs. 1-4, § 6.I; Ex. 5, § 6.H.  As for insurance, the Lease

24  Agreements required CSXIT to carry certain federally mandated insurance, while assigning

25  owner-operators responsibility for securing workers' compensation and bobtail insurance.  *Id.*

26  Exs. 1 to 5 §§ 3, 10.A, 10.D.  Owner-operators had the option to purchase this insurance from

27  providers with whom CSX negotiated reduced rates, and pay for that insurance through a charge-

28  back.  *Id.* Exs. 1-4, § 10.F; Ex. 5, § 10.E.

The Lease Agreements included terms designed to ensure production of the desired result: safe delivery.  For example, to protect against cargo destruction, each agreement required the owner-operator to reimburse CSXIT for "cargo shortage, loss or damage that occur[ed] while in the possession or control of [the owner-operator], due to [the owner-operator's] negligence or breach of obligations."  *Id*. Exs. 1 to 5 § 12.B.  The Lease Agreements empowered CSXIT to enforce this reimbursement obligation through charge-backs (*i.e.* deductions).  *Id*. § 7.D.  The Lease Agreements further required owner-operators to deposit funds in escrow, while obligating CSXIT to maintain these funds in an interest-bearing account and to return them to the owner-operator (less any contractually permitted deductions) no later than forty-five days after the Lease Agreement's termination.  *Id*. § 8.  To the extent the receiver of the shipment delayed in taking possession of the delivery beyond two hours, the COLAs required payment to the owner-operators of a "power detention" penalty at an hourly rate.  *See Id.* ¶¶ 5-6; Exs. 6 to 27 (rate schedules reflecting applicable detention pay rates) ("Detention will be paid on stay-with loads or drop-and-pick loads after two (2) hours free time if the Contractor qualifies. . . . For multiple stop loads, the first stop will pay power detention after two (2) free hours.  All subsequent stops will pay power detention after one (1) hour free time.").  Similarly, if the receiver of the shipment asked the owner-operator to help unload the cargo, or its shipment was over a standard weight limit, the owner-operator received additional payments beyond the cost of transport.  *Id.*, Exs. 6 to 27 (listing pay rates for "accessorials").

## II.     Procedural Background.

In the *Valadez* class action, the named plaintiffs alleged that each owner-operator, notwithstanding the Lease Agreement, had been a CSXIT *employee* under California law, not an independent contractor.  And they alleged that CSXIT failed to comply with numerous provisions of the California Labor Code applicable to employees.  More specifically, they sought relief for: (1) Failure to reimburse employee business expenses, *see* Cal. Lab. Code § 2802; (2) Unlawful deductions from wages, *Id*. § 221; (3) Failure to provide off-duty meal periods, *Id*. § 226.7; (4) Failure to provide off-duty paid rest periods, *Id*. § 226.7; (5) Failure to pay minimum wage, *Id*. § 1182.11; (6) Failure to timely provide wage statements, *Id*. § 226; (7) Violations of the California

1  Unfair Competition Law; and (8) Enforcement of the Private Attorneys General Act ("PAGA").

2  All parties consented to have the matter fully resolved by Magistrate Judge Elizabeth D. Laporte.

3      CSXIT moved for summary judgment, arguing that federal law preempted these claims.

4  The District Court partly agreed:  It held that the Department of Transportation's ("DOT") Truth-

5  in-Leasing Regulations, 49 C.F.R. § 376, *et seq.*, which govern trucking transportation contracts

6  like the Lease Agreements, preempted the plaintiffs' "first and second claims (except for their

7  claim involving reimbursement for cellular telephones)."  *Valadez*, 2017 WL 1416883, at *12, 14.

8  More specifically, the Court held that the federal regulations expressly permitted leases to include

9  the contractual terms that the *Valadez* plaintiffs challenged, and that California law directly

10  contradicted those regulations insofar as it mandated otherwise.  Thus, it held that these claims

11  failed as a matter of law under the doctrine of conflict preemption, and awarded partial summary

12  judgment to CSXIT.  *Id.*[1]

13      Each of the plaintiffs in this case was a member of the putative class in *Valadez*.  But after

14  the *Valadez* plaintiffs abandoned their bid for class treatment, the *Goyal* plaintiffs, using the same

15  attorneys who represent the *Valadez* plaintiffs, filed this action, alleging the identical theories of

16  recovery as those asserted in *Valadez*.  The parties agreed this action and *Valadez* were related;

17  however, the *Goyal* plaintiffs then refused to stipulate to full jurisdiction before Magistrate Judge

18  Laporte, in an effort to avoid her partially adverse summary adjudication ruling in *Valadez*.  (*See*

19  Dkt. No. 29.)  Here, the plaintiffs seek almost exactly the same relief on exactly the same grounds

20  as the named plaintiffs in *Valadez*.  The only difference is that the plaintiffs here are not pursuing

21  relief under PAGA.  *See* Complt. ¶¶ 91–136.

22                  **STANDARD OF REVIEW**

23      "A judgment on the pleadings is properly granted when, taking all the allegations in the

24  pleadings as true, the moving party is entitled to judgment as a matter of law."  *Gregg v. Haw.,*

25  _____

26      [1] CSXIT also moved for dismissal of all claims based on Federal Aviation Administration
    Authorization Act, 49 U.S.C. §14501, which was denied largely based on the Court's then-current
27  interpretation of Ninth Circuit precedent concerning the statute.  Since that argument requires the
    development of facts given the still-current circuit precedent, CSXIT is not raising that argument
28  at this time given this is a motion based on the pleadings, but reserves its right to do so at
    summary judgment.

1    *Dep't of Pub. Safety*, 870 F.3d 883, 887 (9th Cir. 2017) (internal quotation marks omitted).  In

2    making this assessment, courts are free to consider not just the pleadings, but also those

3    documents to which the complaint "refers extensively" or that "form the basis of the plaintiff's

4    claim." *Ritchie*, 342 F.3d at 908.  In this case, the plaintiffs' complaint refers extensively to the

5    Lease Agreements.  In addition, these agreements "form the basis" of the plaintiffs' claims, since

6    each cause of action is predicated on the argument that CSXIT violated state law by contracting

7    with and compensating the plaintiffs in accordance with the agreements' terms.  As such, this

8    Court "may treat" the Lease Agreements—attached as exhibits to this motion—"as part of the

9    complaint, and thus may assume that [their] contents are true for purposes" of this motion.  *Id.*

10   **ARGUMENT**

11        The Supremacy Clause makes federal law "the supreme Law of the Land," U.S. Const.,

12   Art. VI, cl. 2, and thus bars courts from giving "effect to state laws that conflict with federal

13   laws." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1383 (2015).  State and federal

14   laws come into conflict when state law purports to forbid what federal law specifically allows.

15   *See, e.g.*, *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 155-157 (1982) (California

16   law limiting right to use due-on-sale provisions preempted by federal regulation permitting their

17   use); *Chae v. SLM Corp.*, 593 F.3d 936, 948 (9th Cir. 2010) ("If federal law permits late fees and

18   gives up to sixty days for repayment, to say that state law prohibits late fees and requires a

19   prompter repayment period is in conflict.")  They also come into conflict when state law "stands

20   as an obstacle to the accomplishment and execution of the full purposes and objectives" of the

21   federal provision in question.  *Arizona v. United States*, 567 U.S. 387, 399 (2012) (internal

22   quotation marks omitted).  In either circumstance, the state law is preempted by federal law and

23   so is unenforceable.

24        That is what this case involves:  State laws that conflict with federal law, either by

25   prohibiting contractual arrangements that the Truth-in-Leasing Regulations specifically permit, or

26   by standing as an obstacle to the achievement of the goals that the DOT meant to achieve when it

27   promulgated detailed regulations concerning those leases.  This Court, in *Valadez*, 2017 WL

28   1416883, determined that those regulations preempt the plaintiffs' first and second causes of

action, because the regulations affirmatively permit what the underlying state laws purport to prohibit. *Id*. at *9–11.  That ruling—which accords with the majority view of courts around the country—is correct, as the following shows.  The same regulations additionally preempt the plaintiffs' third, fourth, fifth, and seventh causes of action.  And the plaintiffs' second cause of action fails on alternative and independent grounds.  This brief considers each cause of action in turn.

## I.      The Plaintiffs' First Cause of Action Under California Labor Code Section 2802 Fails as a Matter of Law.

The plaintiffs' first cause of action alleges that CSXIT violated Section 2802 of the Labor Code by failing to reimburse them for various expenditures.  That statute says, in relevant part, that an "employer shall indemnify [its] employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer . . . ."  Cal. Lab. Code § 2802(a).  The plaintiffs claim that they incurred at least seven categories of "expenditures" and "losses" as a result of the Lease Agreement:  (1) insurance costs; (2) escrow costs; (3) costs associated with cargo and equipment loss and damages; (4) vehicle-acquisition costs; (5) fuel, maintenance, and operating costs; (6) replacement costs; and (7) cellphone and cellphone application costs.  Complt. ¶ 92.  Except as to cellphone related expenses, CSXIT demonstrates herein that the federal Truth-in-Leasing Regulations affirmatively permit companies and owner-operators to enter into leasing agreements, like the Lease Agreements here, that allocate these costs to owner-operators of the semi-trucks.  These regulations therefore preempt Section 2802 to the extent it requires such reimbursements.

### A.      The Truth-in-Leasing Regulations specifically permit certain contractual terms in leasing agreements like those at issue here.

For decades, commercial enterprises requiring the transportation of goods in interstate commerce have signed contracts with owner-operator semi-truckers for their services, including the use of their trucks. *Am. Trucking Ass'ns v. United States*, 344 U.S. 298, 311 (1953) ("Carriers subject to [Interstate Commerce] Commission jurisdiction have increasingly turned to owner-

1    operator truckers to satisfy their need for equipment as their service demands.  By a variety of

2    arrangements, the authorized carriers hire them to conduct operations under the former's permit

3    or certificate.").  These contracts typically take the form of a lease, in which the motor-carrier[2]

4    leases the owner-operator's semi-truck and retains his services too.  Federal law authorizes the

5    Transportation Secretary to regulate the relationships between semi-truck owner-operators and

6    the companies entering those leases, "including required terms of their leases."  *Rodriguez v.*

7    *RWA Trucking Co., Inc.*, 238 Cal. App. 4th 1375, 1386 (Ct. App. 2013).  The Secretary exercised

8    this authority by promulgating the Truth-in-Leasing Regulations.  *See* 49 C.F.R. § 376, *et seq.*  In

9    this case, in order to arrange for the occasional transport of freight on and off terminal property

10   for customers using rail transportation, CSXIT is an authorized motor carrier, for which it

11   maintains a DOT issued motor carrier permit and entered into lease agreements with semi-truck

12   owner-operators, including plaintiffs.

13          The Truth-in-Leasing Act requires entities (like CSXIT) who need to move freight by

14   semi-trucks regulated by the DOT, and who lease semi-trucks, to comply with the Truth-in-

15   Leasing Regulations.  *See* 49 U.S.C. § 14102.  These regulations require the parties to record the

16   terms of their agreements in a written lease.  49 C.F.R. § 376.11 ("There shall be a written lease

17   granting the use of the equipment and meeting the requirements contained in § 376.12.").  While

18   often phrased in terms of disclosure requirements, these regulations affirmatively authorize

19   substantive terms between the parties, and regulate how those terms must be disclosed when

20   applicable.  For example:

21          •   Section 376.12(e) requires the parties to disclose "the responsibility of each party

22              with respect to the cost of fuel," but leaves them free to allocate that responsibility

23              as they see fit;

24   _____

25          [2] A motor carrier is defined and regulated by 49 U.S.C. § 13902, as a person or entity that
     transports with the use of self-propelled motor vehicles, and whom the Secretary of
26   Transportation has determined will comply with all DOT safety requirements, financial
     responsibility requirements, accessibility requirements and employer obligations that are imposed
27   by the Secretary.  Any person or entity that needs roadway transportation of bulk cargo by tractor-
     trailer can become a "motor carrier" by following the registration requirements under the Federal
28   Motor Carrier Safety Administration (FMCSA) regulations.

- Section 376.12(e) also requires the parties to disclose "detention and accessorial services . . . [and] who is responsible for loading and unloading the property onto and from the motor vehicle, and the compensation, if any, to be paid for this service."

- Section 376.12(j)(1) requires the parties to "specify who is responsible for providing" certain forms of "insurance coverage for the operation of the leased equipment . . . ," and thus permits the parties to make the owner-operator responsible for providing such insurance;

- Section 376.12(k) permits the parties to arrange for an escrow account to protect against the owner-operator's non-performance, provided the lease "specif[ies] . . . [t]he amount of any escrow fund or performance bond required to be paid by the lessor to the authorized carrier or to a third party"; and

- Section 376.12(j)(3) states that any "lease shall clearly specify the conditions under which deductions for cargo or property damage may be made from the lessor's settlements," thereby authorizing such deductions.

Numerous courts—including *this* Court, in *Valadez*, 2017 WL 1416883, at *9—have held that these provisions permit the parties to use the substantive terms in question.  Specifically, this Court, the United States District Court for the District of Massachusetts, and the California Court of Appeals all agree that these provisions affirmatively permit parties to adopt the arrangements for which disclosure is mandated under the Truth-in-Leasing Regulations.  *See id.*; *see also Remington v. J.B. Hunt Transp., Inc.*, Nos. 15-10010-RGS, 15-13019-RGS, 2016 WL 4975194, *3 (D. Mass. Sept. 16, 2016); *Rodriguez*, 238 Cal. App. 4th at 1386-1387.

These holdings comport with the common-sense proposition that anything which must be disclosed is implicitly permitted.  Just as federal laws regulating tobacco "labeling and advertisement" implicitly permit the sale of cigarettes, *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 139 (2000); *accord Conley v. R.J. Reynolds Tobacco Co.*, 286 F. Supp. 2d 1097, 1107–08 (N.D. Cal. 2002), so too do federal regulations requiring disclosure of substantive contractual terms implicitly permit those terms.

Moreover, the Truth-in-Leasing Regulations make clear what parties may, may not, and must do in connection with leasing agreements, and the regulations force parties to clearly state in writing their agreed-upon terms.  The notion that federal regulations can authorize contractual arrangements that state law renders unenforceable is simply untenable.

> **B.  The Truth-in-Leasing Regulations preempt the plaintiffs' first cause of action under Section 2802 except as to one narrow theory of relief.**

Again, the plaintiffs' first claim for relief alleges that CSXIT violated Section 2802 of the Labor Code by failing to reimburse them for six categories of expenditures and losses:  (1) insurance costs; (2) escrow costs; (3) costs associated with cargo and equipment loss and damages; (4) vehicle-acquisition costs; (5) fuel, maintenance, and operating costs; (6) replacement costs; and (7) cellphone and cellphone application costs.  Complt. ¶ 92.  The plaintiffs claim that Section 2802 entitles them to reimbursement for all of these expenditures.  With respect to the first six categories of expenditures, they are wrong, because federal law affirmatively permits leasing agreements that assign these expenditures to owner-operators.

***Insurance Costs.***  In its contracts with the plaintiffs, CSXIT agreed to maintain certain insurance coverage itself; specifically, the insurance that 49 U.S.C. § 13906 requires.  Kennedy Decl. Exs. 1 to 5, §§ 3, 10.A.  But it also assigned to plaintiffs the responsibility to maintain various other forms of insurance, including non-trucking insurance (also known as "bobtail" or "deadhead" insurance) and workmen's compensation insurance.  *Id.*, Exs. 1 to 5, § 10.D.  The Leasing Agreements, however, gave owner-operators the option of allowing CSXIT to broker these other forms of insurance for them, and to have the costs of doing so "charged back" to them.  Kennedy Decl. Exs. 1 to 4, § 10.F; Ex. 5, § 10.E.

The plaintiffs argue that Section 2802 entitled them to reimbursement for these other forms of insurance.  This Court, the District of Massachusetts, and the California Court of Appeal, have all rejected precisely that argument.  *See Valadez*, 2017 WL 1416883, at *9; *Remington*, 2016 WL 4975194, at *3, and *Rodriguez*, 238 Cal. App. 4th at 1389.  Rightly so.

Section 376.12(j)(i) says:

The lease shall clearly specify the legal obligation of the authorized carrier to maintain insurance coverage for the protection of the public pursuant to FMCSA regulations under 49 U.S.C. § 13906.  The lease shall further specify who is responsible for providing *any other insurance coverage for the operation of the leased equipment*, such as bobtail insurance.  If the authorized carrier will make a charge back to the lessor for any of this insurance, the lease shall specify the amount which will be charged-back to the lessor.

(emphasis added).

The "first sentence" of this section "establishes that all carriers must maintain public liability and property damage insurance" as required by 49 U.S.C. § 13906.  *Owner-Operator Indep. Drivers Ass'n v. United Van Lines, LLC*, 556 F.3d 690, 697 (8th Cir. 2009) (citation omitted).  CSXIT did that.  Kennedy Decl. Exs. 1 to 5, §§ 3, 10.A.  "The second sentence provides that carriers and drivers may decide who is responsible for maintaining other insurance, such as bobtail insurance."  *Owner-Operator*, 556 F.3d at 697.  CSXIT and the plaintiffs did that, with the plaintiffs agreeing to accept this responsibility.  *Id.* § 10.D.  "The third sentence permits the carrier to charge back to the driver 'any of this insurance.'"  *Owner-Operator*, 556 F.3d at 697 (citation omitted).  CSXIT did that too, charging back some of the insurance that it agreed to purchase on the plaintiffs' behalf.  Kennedy Decl. Exs. 1 to 4, §§ 7.D, 10.F; Ex. 5, §§ 7.D, 10.E.

In sum, CSXIT complied with § 376.12(j)(1) by agreeing to a contract that made the semi-truck owner-operators responsible for insurance.  The plaintiffs now seek to hold it liable under state law for doing so—to punish conduct that federal law affirmatively allows.  That is not permitted.  *Fid. Fed. Sav. & Loan Ass'n*, 458 U.S. at 155.  It follows that § 376.12(j)(1) preempts Section 2802 to the extent the latter requires CSXIT to cover those costs itself via reimbursement.  That is exactly what this Court held in *Valadez*, when it determined that Section 2802 is preempted insofar as it requires carriers like CSXIT to reimburse insurance costs like those at issue here.  *See Valadez*, 2017 WL 1416883, at *9.

**Escrow Costs**.  The Leasing Agreements required the plaintiffs to maintain an escrow account "to guarantee [their] performance of all conditions and covenants."  Kennedy Decl. Exs.

1 to 5, § 8.A.  The plaintiffs now seek reimbursement of money deducted from those accounts.

But the Truth-in-Leasing Regulations preempt Section 2802 to the extent the statute supports the

plaintiffs' claim for reimbursement.  The Truth-in-Leasing Regulations permit the escrow

arrangement in the Lease Agreements.  The regulations state that lessors "shall specify . . . [t]he

amount of any escrow fund or performance bond required to be paid *by the lessor* [here, the

plaintiffs] to the authorized carrier [here, CSXIT]."  § 376.12(k)(1) (emphasis added).  Yet,

plaintiffs argue that Section 2802 effectively prohibits the use of escrow funds insofar as it

requires carriers to reimburse any funds withdrawn from escrow.  If Section 2802 really does

require such reimbursements, it is preempted and unenforceable.

In addition to effectively banning what federal law prohibits, Section 2802 is preempted

because it stands as an obstacle to the achievement of the Truth-in-Leasing Regulations'

purposes.  Again, by requiring reimbursements of security funds placed in escrow, Section 2802

would make it practically impossible to use escrow accounts.  By eliminating carriers' ability to

protect themselves with an escrow account, Section 2802 would deter them from entering into

leases with owner-operators at all, and thus stands as an obstacle to the objectives the DOT set

out to achieve with the Truth-in-Leasing Regulations—namely, the policy of making leases

available and mutually beneficial.  *Valadez* already so held, and rightly so.  *Valadez,* 2017 WL

1416883, at *9.

***Cargo and equipment losses and damages***.  Plaintiffs additionally claim that the Leasing

Agreements violated Section 2802 by making the owner-operators responsible in some

circumstances for the costs of damages to and losses of cargo and equipment.  *See* Kennedy Decl.

Exs. 1 to 5, § 7.D.  If that is true, then the Truth-in-Leasing Regulations once again preempt

Section 2802.  *Valadez*, 2017 WL 1416883, at *10.  The reason is 49 C.F.R. § 376.12(j)(3), which

"permits leases to specify conditions under which deductions for such damages may be made

from the owner-operator's settlements." *Valadez*, 2017 WL 1416883, at *10; *accord* §

376.12(j)(3) ("The lease shall clearly specify the conditions under which deductions for cargo or

property damage may be made from the lessor's settlements.").  Since requiring reimbursement of

such deductions amounts to their prohibition—why make a deduction if the person from whom

1  the funds are deducted must be paid back?—Section 2802 is preempted if it requires these

2  reimbursements.

3       ***Vehicle-Acquisition Costs.***  The Lease Agreements expressly provided that each owner-

4  operator would lease his own vehicle to CSXIT.  In other words, each would lease to CSXIT a

5  tractor-trailer that he had already acquired for himself.  Consistent with the notion that CSXIT

6  would *lease* the vehicles rather than buying its own, CSXIT nowhere agreed to pay the owner-

7  operators' vehicle-acquisition costs.

8       The plaintiffs now contend that this arrangement violated Section 2802.  That statute, they

9  argue, required CSXIT to reimburse them for the money spent purchasing or leasing their tractor-

10  trailers.  Complt. ¶ 19.  The problem with this position is that Section 2802 conflicts with the

11  Truth-in-Leasing Regulations, and is therefore preempted, if it really does require trucking

12  companies to pay owner-operators' truck acquisition costs.  The conflict arises because the

13  regulations "expressly contemplate that carriers and owner-operators will enter leases whereby

14  the owner-operators provide *their* vehicles to the carriers." *Valadez*, 2017 WL 1416883, at *9

15  (emphasis added).  For example, § 376.12(a) states that all leases "shall be made between the

16  authorized carrier and the *owner* of the equipment."  (Emphasis added).  Similarly, § 376.12(c)(1)

17  obligates the owner-operator to give the authorized carrier "exclusive possession, control, and use

18  of the equipment for the duration of the lease," while § 376.12(e) recognizes that owner-operators

19  will "retake[] possession of the equipment upon termination of the lease agreement."

20       In sum, each provision allows for companies like CSXIT *to lease* vehicles from owner-

21  operators.  Since it would be nonsensical for motor carriers to enter into these arrangements if

22  they had to pay the owner-operators' vehicle-acquisition costs, and then, on top of that, the cost of

23  leasing the very same vehicle, requiring the carriers to do so would stand as an obstacle to the

24  DOT's policy of making such leases available—a policy that the Truth-in-Leasing Regulations

25  are supposed to advance.  Section 2802 of the Labor Code is thus preempted to the extent it does

26  so.

27       ***Fuel, Maintenance, and Operating Costs***.  A defining feature of independent contractors

28  is that they generally supply their own "instrumentalities" and "tools." *S. G. Borello & Sons, Inc.*

*v. Dep't of Indus. Relations*, 48 Cal. 3d 341 (1989).  Because the Lease Agreements envisioned the plaintiffs serving as independent contractors, the agreements allocated to the plaintiffs responsibility for their vehicles' fuel, maintenance, and other operating costs.  *See* Kennedy Decl. Exs. 1 to 4, §§ 2, 6.I; Ex. 5, §§ 2, 6.H.

The plaintiffs claim that, under Section 2802, they should have been reimbursed for such expenditures.  Again, however, Section 2802 conflicts with and is preempted by the Truth-in-Leasing Regulations if it really does require such reimbursements.  The regulations "expressly contemplate that carriers and owner-operators will enter leases whereby the owner-operators provide their vehicles to the carriers."  *Valadez*, 2017 WL 1416883, at *9.  The viability of these arrangements would be significantly hampered—frustrating the federal government's purposes in promulgating the regulations—if every carrier were obligated by law to make reimbursements for whatever indeterminate portion of an owner-operator's maintenance and operating costs were attributable to work performed on its behalf (and not on behalf of some other person or entity).  And in any event, § 376.12(e) expressly permits the parties to allocate these costs as they see fit; it says that each "lease shall clearly specify the responsibility of each party with respect to the cost of fuel, fuel taxes, empty mileage, permits of all types, tolls, ferries, detention and accessorial services, base plates and licenses, and any unused portions of such items."

Taken together, these regulations and the leases they envision either directly conflict with, or would be frustrated by, state laws like Section 2802 that require reimbursement for fuel, maintenance, and operating costs.  *Valadez* already so held, 2017 WL 1416883, at *9–*10, and *Remington* reached the same conclusion with respect to a Massachusetts law purporting to require reimbursement of operating costs.  2016 WL 4975194, at *3–4.  They were right, and this Court should follow their lead.

**Replacement Costs.**  The plaintiffs additionally seek reimbursement for the cost of replacing their trucks "with more energy efficient and less polluting vehicles (in compliance with restrictions on trucking companies by, inter alia, the California Air Resources Board)," and for upgrading existing trucks to meet new efficiency and pollution standards.  Complt. ¶ 92.  This claim, however, is just a combination of the previous two:  Replacing a truck means purchasing a

1    truck, while upgrading a truck to comply with legal requirements is a maintenance or "operating
2    cost."  Just as the previous theories failed, so too does this one.

3         ***Cellphone and cellphone applications costs.***  CSXIT tracks shipments using smart-phone
4    applications.  Accordingly, those who wish to work with CSXIT to provide drayage services must
5    use these applications.  The Leasing Agreements assign owner-operators responsibility for the
6    costs of "[a]ll mobile communications equipment and service costs."  Kennedy Decl. Exs. 1 to 4,
7    § 6.I; Ex. 5, § 6.H.  The plaintiffs claim that, under Section 2802, CSXIT should have reimbursed
8    them for the costs of acquiring and maintaining their smart phones.  CSXIT disputes that it owes
9    reimbursement for these costs, but not on Truth-in-Leasing preemption grounds.  Accordingly, it
10   does not seek judgment on the pleadings as to this singular theory.

11   **II.    The Plaintiffs' Second Cause of Action Should Be Dismissed in its Entirety.**

12        In the plaintiffs' second cause of action, they accuse CSXIT of making improper
13   deductions "to cover certain ordinary business expenses . . . including but not limited to, payment
14   for cargo equipment loss and damage and escrow account payments."  Complt. ¶ 101.  As
15   explained above, the Leasing Agreements expressly allowed CSXIT to deduct these expenses
16   from the amounts paid to the plaintiffs, and these theories are "preempted by the same TIL
17   Regulations that preempt Plaintiffs' similar Section 2802 claim."  *Valadez*, 2017 WL 1416883, at
18   *11.  Moreover, the second cause of action fails without regard to preemption, since neither
19   Section 221 nor Wage Order 9 entitles Plaintiffs to relief.

20        **A.    The Truth-in-Leasing Regulations preempt the plaintiffs' second cause of**
21             **action.**

22        Section 221 makes it "unlawful for any employer to collect or receive from an employee
23   any part of wages theretofore paid by said employer to said employee."  Wage Order 9 similarly
24   prohibits making "any deduction from the wage or requir[ing] any reimbursement from an
25   employee for any cash shortage, breakage, or loss of equipment, unless it can be shown that the
26   shortage, breakage, or loss is caused by a dishonest or willful act, or by the gross negligence of
27   the employee."  Wage Order No. 9, § 8.  According to the plaintiffs, CSXIT violated both
28   provisions by "taking deductions from [their] compensation to cover certain ordinary business

1   expenses of Defendants, including but not limited to, payment for cargo equipment loss and

2   damage and escrow account payments."  Complt. ¶ 101.

3       As *Valadez* recognized, the plaintiffs' "[s]ection 221 claim for unlawful deductions for

4   cargo equipment loss and escrow account payments is preempted by the same [Truth-in-Leasing]

5   Regulations that preempt Plaintiffs' similar Section 2802 claim for unlawful failure to reimburse

6   for cargo equipment loss and escrow account payments."  2017 WL 1416883, at *11.

7       **B.      The second cause of action facially fails as alleged and therefore does not give**

8       **rise to liability.**

9       Even if Section 221 of the Labor Code is not preempted, it does not entitle the plaintiffs to

10  any relief because the plaintiffs' claim fails on its face.  Accordingly, this Court can also dismiss

11  the second cause of action on state law grounds.

12      Labor Code Section 221 states:  "It shall be unlawful for any employer to collect or

13  receive from an employee any part of wages theretofore paid by said employer to said employee."

14  California courts interpret this statute in the same manner that they interpret any other:  They

15  "look first to its words, assigning them their usual and ordinary meanings, and reading them in

16  context.  If the words themselves are clear," then "the plain meaning governs."  *Prachasaisoradej*

17  *v. Ralphs Grocery Co., Inc.*, 165 P.3d 133, 137 (Cal. 2007).  Since Section 221 prohibits only the

18  receipt of wages "theretofore paid," the key interpretive question involves the meaning of

19  "theretofore."  And on this score, the statute is unambiguous.  When the legislature enacted

20  Section 221 in 1937, "theretofore" meant exactly what it means today:  "Up to that time; until

21  then; before then."  Webster's Second New International Dictionary 2621 (1934); *accord* The

22  American Heritage Dictionary of the English Language 1806 (5th ed. 2016) ("Until that time;

23  before that."); Black's Law Dictionary 1707 (10th ed. 2014) ("Until that time; before that time").

24  The law thus prohibits the "recapture of wages already earned or paid."  *Prachasaisoradej*, 165

25  P.3d at 145.  It does not prohibit deductions from wages to be paid at some point in the future.

26      Though Section 221 forbids the recapture of wages, other portions of the Labor Code state

27  expressly that parties *may* agree to deductions from wages.  Specifically, California Labor Code

28  Section 224 prohibits reading Section 221 to "make it unlawful for an employer to withhold or

1    divert any portion of an employee's wages . . . when a deduction is expressly authorized in

2    writing," so long as the deduction in question does not "amount[] to a rebate or deduction from

3    the standard wage arrived at by collective bargaining or pursuant to wage agreement or statute[.]"

4         The plaintiffs allege that CSXIT violated Section 221 by deducting particular sums from

5    their compensation.  The complaint specifically lists "payment[s] for cargo equipment and

6    damage," along with "escrow account payments," and implies that its claim "include[s]" other

7    deductions provided for in the Lease Agreements.  All of these deductions took the form of

8    charge-backs, in which CSXIT deducted the recoverable sums from "the gross compensation

9    otherwise payable to [the owner-operator] at settlement," or from the escrow fund that CSXIT

10   was contractually required to maintain on the plaintiffs' behalf.  Kennedy Decl. Exs. 1 to 5, §§

11   7.D, 8.  The Lease Agreements do not permit CSXIT to demand the return of sums already paid,

12   and the plaintiffs do not allege that CSXIT recaptured money that had already been paid.

13        Even if all of the alleged facts are true, the plaintiffs' Section 221 claim fails for two

14   separate reasons:  *First*, even on the facts alleged, CSXIT's deductions do not constitute the

15   receipt or collection "of wages *theretofore* paid."  Cal. Lab. Code § 221 (emphasis added).  In

16   other words, the plaintiffs have not alleged that CSXIT, by making deductions from the plaintiffs'

17   final settlements or from the escrow accounts, was "recaptur[ing] … wages already earned or

18   paid."  *Prachasaisoradej*, 165 P.3d at 145.  To the contrary, it is alleged to have made the

19   deductions *before* payment (or before the return of escrow), and *as part of* the determination

20   regarding what the plaintiffs "earned" under the Lease Agreements.  So Section 221 is

21   inapplicable by its terms.

22        *Second*, the Lease Agreements expressly authorized CSXIT to make the deductions at

23   issue from the plaintiffs' final settlement and from the escrow accounts.  Thus, the deductions

24   here are "expressly authorized in writing by the employee."  Cal. Lab. Code § 224.  And since the

25   deductions do "not amount[] to a rebate or deduction from the standard wage arrived at by

26   collective bargaining or pursuant to wage agreement or statute," the Labor Code expressly makes

27   this in-writing agreement enforceable, Section 221 notwithstanding.  *Id*.  In sum, the plaintiffs

28   seek relief for agreed-upon deductions made *before* the payment of "wages."  It follows that their

1  claim under Section 221 fails as a matter of law, since that statute applies only to the recapture of

2  wages "theretofore paid," and because it does *not* apply to contractually agreed-to deductions.

3      Thus, even if the facts alleged are true, then the plaintiffs are not entitled to relief under

4  Section 221 of the Labor Code.  Their second cause of action therefore fails as a matter of law

5  and CSXIT is entitled to judgment in its favor.

6  **III.    Federal Law Preempts the Plaintiffs' Third, Fourth, and Fifth Causes of Action.**

7      The Truth-in-Leasing Regulations preempt plaintiffs' third, fourth, and fifth causes action

8  each of which challenges the terms of the plaintiffs' compensation.  The plaintiffs' third cause of

9  action alleges that CSXIT violated Labor Code Sections 226.7 and 512, along with Wage Order

10  9, by failing to provide one 30-minute meal period for up to 10 hours worked.  Complt. ¶¶ 104–

11  06.  The fourth cause of action is predicated on the theory that CSXIT violated the Wage Order

12  and Labor Code Section 226.7 by failing to provide sufficient rest periods.  Finally, the plaintiffs'

13  fifth cause of action claims that CSXIT failed to satisfy state minimum-wage laws.  Complt. ¶

14  113 (citing Cal. Lab. Code §§ 1182.11, 1182.12, and 1197, and Wage Order 9).

15      The Truth-in-Leasing Regulations preempt all three of these claims.  Those regulations

16  expressly give lessors and lessees freedom to negotiate the terms of compensation:  "The amount

17  to be paid may be expressed as a percentage of gross revenue, a flat rate per mile, a variable rate

18  depending on the direction traveled or the type of commodity transported, *or by any other method*

19  *of compensation mutually agreed upon* by the parties to the lease."  49 C.F.R. § 376.12(d)

20  (emphasis added).  This flatly contradicts California state laws that dictate the terms of

21  compensation, such as laws setting minimum-wage requirements and those dictating the terms of

22  meal and rest breaks.

23      The conflict is particularly stark because the California laws at issue give parties very

24  little room to negotiate over rest break, meal break, and other compensation terms at all.  For

25  example, Section 226.2—the section that addresses rest break requirements for piece-rate

26  workers, which the plaintiffs are apparently attempting to enforce via Section 226.7—dictates that

27  "[e]mployees *shall* be compensated for rest and recovery periods," Section 226.2(a)(1) (emphasis

28  added).  California courts interpret this provision as strictly barring employers and employees

from agreeing by contract to different terms, *even if* the agreed-to terms would compensate an

employee *more* on net.  *See Bluford v. Safeway Stores, Inc.*, 216 Cal. App. 4th 864, 872 (Ct. App.

2013).  Similarly, California's minimum wage laws require that "employees must be

compensated for each hour worked at either the legal minimum wage or the contractual hourly

rate, and compliance cannot be determined by averaging hourly compensation."  *Id.* (citing

*Armenta v. Osmose, Inc.*, 135 Cal. App. 4th 314, 323 (Ct. App. 2005)).  These laws dictate the

manner in which employees *must be* paid, and they prohibit parties from contractually deviating

from these terms even in mutually beneficial ways:  a contract that appears to leave some work

unpaid, but that pays the employee more in terms of an hourly average, is illegal.  *Id.*  These

requirements conflict head-on with the contract regime envisioned by the Truth-in-Leasing

Regulations, which permits "any . . . method of compensation mutually agreed upon by the

parties to the lease."  49 C.F.R. § 376.12(d).

Plaintiffs' minimum wage theory is premised on the argument that they were not

compensated at all for time spent working beyond the actual drive time – *e.g.*, time spent waiting

for the shippers or receivers of the cargo to unload or load the cargo containers.  But the first two

hours of this "waiting" time is implicitly covered by the contractual payment for the drive,

because the COLAs expressly provide for an hourly rate of pay to begin once that two hour

threshold has been surpassed.  Kennedy Decl. ¶ 5, Exs. 6 to 27 (rate schedules providing for

"detention compensation").  This "detention" pay is expressly addressed by, and therefore

allowed by, the TIL Regulations.  Section 376.2(m) defines "detention" as "[t]he holding by a

consignor or consignee of a trailer, with or without power unit and driver, *beyond the free time*

*allocated for the shipment*, under circumstances not attributable to the performance of the

carrier."  (Emphasis added.)  Consequently, the TIL Regulations expressly discuss (and thus

authorize) including some amount of waiting ("free") time beyond that allocated for the actual

drive time to be included in the price negotiated for the shipment.  In addition, Section 376.12(e)

requires the parties to disclose "detention and accessorial services . . . [and] who is responsible for

loading and unloading the property onto and from the motor vehicle, and the compensation, *if*

*any*, to be paid for this service."  (Emphasis added.)  Consequently, the TIL Regulations

1    implicitly authorize *both* the inclusion of some amount of "free" or "waiting" time within the

2    compensation negotiated for the shipment (or drive), *as well as* separate, additional compensation

3    for "detention" *beyond* the "free" or "waiting" time that is included in the cost of the move.  The

4    COLAs do exactly that.

5            In addition, to the extent a shipper or receiver asked a plaintiff to do anything other than

6    "wait," *e.g.,* to count inventory, help load or unload cargo, or clean the container before the

7    shipper loads its product onto the container, those "accessorial" tasks were expressly identified in

8    the rate schedules that were part of the COLAs – along with the compensation for each task.  This

9    is in accordance with the TIL Regulations, which require disclosure of all "accessorial services"

10   and how they will be compensated – *if at all*.  Thus the methods of compensation for these tasks

11   are substantively authorized and cannot form the basis of a minimum wage claim.[3] 49 C.F.R. §

12   376.12(e).[4]

13           It follows from the foregoing that the regulations preempt the California statutes on which

14   the plaintiffs' third, fourth, and fifth causes of action are based.  It is true that this Court, in

15   *Valadez*, rejected CSXIT's argument that the Truth-in-Leasing Regulations preempt California's

16   compensation laws.  2017 WL 1416883, at *13.  It reasoned that, because the Truth-in-Leasing

17   Regulations "are silent as to minimum hourly compensation, and required meal and rests breaks,"

18   the claims alleging violations of wage and break laws were not preempted.  *Id*.  Respectfully, that

19   does not follow.  While the regulations do not expressly address the precise terms that the parties

20   may choose between, they do permit contracting parties to agree to "*any . . .* method of

21   compensation mutually agreed upon."  49 C.F.R. § 376.12(d) (emphasis added).  And, with

22   respect to waiting time and "accessorials," § 376.12(e) expressly requires their disclosure, so they

23   cannot form the basis of Plaintiffs' minimum wage claim.  Thus, California's wage and break

24   laws constrain this freedom by making some "methods of compensation" off limits.  Accordingly,

25           [3] In fact, the semi-truck owner operators could fare far better than the minimum wage
26   based on these accessorial rates in the COLAs.  For example, if a semi-truck owner operator was
     asked to clean a trailer, the owner operator was paid a flat rate of $15.00 for trailer cleaning, even
27   if it took a fraction of an hour.  Kennedy Decl. Exs. 6 to 27.

28           [4] The TIL Regulations' treatment of detention pay and accessorial tasks was not raised by
     CSXIT or considered by Judge Laporte in *Valadez*.

1    the provisions directly conflict, and federal law must take precedence.  CSXIT is therefore

2    entitled to judgment on the pleadings.

3    **IV.    The Truth-in-Leasing Regulations Preempt Plaintiffs' Seventh Cause of Action**

4    **        Arising Under Business & Professions Code Section 17200.**

5            Finally, the Truth-in-Leasing Regulations preempt the plaintiffs' seventh cause of action,

6    which alleges that CSXIT violated California's Unfair Competition Law.  *See* Cal. Bus. & Prof.

7    Code §§ 17200–09.  According to the plaintiffs, CSXIT violated the Unfair Competition Law in

8    the following ways:

9           • "failing to reimburse Plaintiffs for employment-related business expenses and

10            losses";

11          • "improperly and unlawfully making deductions from Plaintiffs' compensation

12            because of payment shortages, breakage, and other work-related expenses and

13            losses . . . ";

14          • "failing to provide adequate, off-duty meal periods to Plaintiffs and failing to pay

15            them premium pay for missed meal periods";

16          • "failing to permit and authorize adequate and paid off-duty rest periods to

17            Plaintiffs and failing to pay them premium pay for misses/unpaid rest periods"

18          • "failing to pay minimum wage compensation to Plaintiffs for all hours worked";

19            and

20          • "improperly and unlawfully making deductions from Plaintiffs' compensation for

21            work-related expenses and losses not attributable to Plaintiffs' dishonest or willful

22            act or gross negligence."

23   Complt. ¶ 125(a)–(f).

24          These are precisely the same allegations that undergird the first, second, third, fourth, and

25   fifth causes of action addressed above.  And as the foregoing showed, state laws are preempted to

26   the extent they regulate this conduct.  Accordingly, just as the Truth-in-Leasing Regulations

27   preempt Labor Code violations that rest on that alleged conduct, *see above* at 8–20, so too do they

28   preempt Unfair Competition Law claims based on the same.

1

\*       \*       \*

2   Federal law preempts the plaintiffs' second, third, fourth, fifth, and seventh causes of

3 actions in their entirety.  It almost entirely preempts the plaintiffs' first cause of action; the only

4 claim therein as to which CSXIT does not seek dismissal at this time is plaintiffs' claim for

5 "reimbursement for cellular telephones."  *Valadez*, 2017 WL 1416883, at \*14.

6

**CONCLUSION**

7   The plaintiffs' second, third, fourth, fifth, and seventh causes of action all fail as a matter

8 of law.  The Court should therefore enter judgment on the pleadings as to each of these causes of

9 action.  The Court should also enter judgment on the pleadings pursuant to Truth-in-Leasing

10 preemption as to the plaintiffs' first cause of action, *except* to the extent that the plaintiffs seek

11 reimbursement for costs related to their use of cellphones on the job.

12

13 Dated:  July 12, 2018      Respectfully submitted,

14

15           By:  /s/ Amanda C. Sommerfeld

16             Amanda C. Sommerfeld

17           JONES DAY
             Attorneys for Defendant

18           CSX INTERMODAL TERMINALS, INC.

19

20

21

22

23

24

25

26

27

28